IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| J.G.[1] | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| FRANK BISIGNANO, | : | NO.  21-1968 |
| Commissioner of Social Security | : | |

**MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                                    February 6, 2026

Plaintiff seeks review of the Commissioner's decision denying her applications for

disability insurance benefits ("DIB") and supplemental security income ("SSI").  For the

reasons that follow, I conclude that the decision of the Administrative Law Judge

("ALJ") is supported by substantial evidence and affirm the Commissioner's decision.

## I.     PROCEDURAL HISTORY

Plaintiff's case has been through three ALJ decisions on its way to judicial review.

She applied for SSI and DIB on December 1 and December 14, 2015, respectively,

alleging disability as of December 1, 2015, based on bipolar disorder, depression,

anxiety, hypothyroidism and irritable bowel syndrome.  Tr. at 259, 271, 551, 554.  Her

applications were denied initially, id. at 257-280, and she requested an administrative

hearing.  Id. at 360-64.  Following a hearing on March 16, 2018, id. at 183-230, ALJ

Peter Train issued an unfavorable decision on June 27, 2018.  Id. at 284-300.  On October

---

[1]Consistent with the practice of this court to protect the privacy interests of plaintiffs in social security cases, I will refer to Plaintiff using her initials.  See Standing Order – In re:  Party Identification in Social Security Cases (E.D. Pa. June 10, 2024).

21, 2019, the Appeals Council remanded the matter for further evaluation of Plaintiff's Residual Functional Capacity ("RFC"), specifically to account for Plaintiff's limitations in interacting with others, further elaboration on ALJ Train's finding that Plaintiff would be off task more than 25% of the workday, and the extent to which drug addiction and alcoholism contribute to Plaintiff's disability. Id. at 305-07. Upon remand, ALJ Randy Riley (hereafter "the ALJ" or "ALJ Riley") convened a hearing on March 24, 2020, and issued an unfavorable decision on April 23, 2020. Id. at 329-41. The Appeals Council denied Plaintiff's request for review on March 2, 2021. Id. at 348-54.

Plaintiff sought review in this Court on April 28, 2021. Doc. 1. On November 2, 2021, the Court granted the Commissioner's uncontested motion for remand due to a corrupted recording of the second hearing. Docs. 5-7. Following remand, the Appeals Council directed ALJ Riley to conduct a de novo hearing, complete the record, and issue a new decision. Tr. at 321-25. ALJ Riley convened a new hearing on October 25, 2022, id. at 231-56, at which Plaintiff amended her disability claim to request a closed period of disability from December 1, 2015, through September 30, 2021, after which she reported engaging in substantial gainful activity. Id. at 235. ALJ Riley issued an unfavorable decision on November 3, 2022. Id. at 128-53. The Appeals Council denied review on August 17, 2023, making ALJ Riley's November 3, 2022 decision the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 416.1481. The Commissioner then filed an uncontested motion to enter judgment, which this court granted. Docs. 10-12.

Stating that she had never received the Appeals Council's decision denying review, Plaintiff moved to set aside the judgment, and the Commissioner likewise moved

to reopen the case.  Docs. 12 & 14.  The Court granted those motions, Doc. 15, and the

matter is now ripe for review following briefing from the parties.  Docs. 17-19.

## II.    <u>LEGAL STANDARD</u>

The court's role on judicial review is to determine whether the Commissioner's

decision is supported by substantial evidence.  42 U.S.C. § 405(g); <u>Schaudeck v. Comm'r</u>

<u>of Soc. Sec.</u>, 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is

whether there is substantial evidence to support the Commissioner's conclusions that

Plaintiff is not disabled.  Substantial evidence is "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion," and must be "more than a mere

scintilla."  <u>Zirnsak v. Colvin</u>, 777 F.2d 607, 610 (3d Cir. 2014) (quoting <u>Rutherford v.</u>

<u>Barnhart</u>, 399 F.3d 546, 552 (3d Cir. 2005)); <u>see</u> <u>also</u> <u>Biestek v. Berryhill</u>, 587 U.S. 97,

103 (2019) (substantial evidence "means only – 'such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion'") (quoting <u>Consol. Edison Co. v.</u>

<u>NLRB</u>, 305 U.S. 197, 229 (1938)).  The court has plenary review of legal issues.

<u>Schaudeck</u>, 181 F.3d at 431.

To prove disability, a claimant must demonstrate an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected to last for . . . not less than twelve

months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process,

evaluating:

> 1.    Whether the claimant is currently engaged in
> substantial gainful activity;

2.      If not, whether the claimant has a "severe" impairment" that significantly limits her physical or mental ability to perform basic work activities that has lasted or is expected to last for a continuous period of 12 months;

3.      If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;

4.      If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform her past work; and

5.      If the claimant cannot perform her past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014); see also 20 C.F.R. §

416.920(a)(4).  Plaintiff bears the burden of proof at steps one through four, while the

burden shifts to the Commissioner at the fifth step to establish that the claimant is capable

of performing other jobs in the local and national economies, in light of her age,

education, work experience, and RFC.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88,

92 (3d Cir. 2007).

## III.   DISCUSSION

### A.   ALJ's Findings and Plaintiff's Claims

In the November 3, 2022, decision under review, the ALJ found at step one that

Plaintiff did not engage in substantial gainful activity from December 1, 2015, through

September 30, 2021, the requested period of disability.  Tr. at 131.  At step two, the ALJ

found that Plaintiff suffers from several severe impairments; bipolar disorder, generalized

4

anxiety disorder, posttraumatic stress disorder (PTSD), bulimia nervosa ("bulimia"), insomnia, and polysubstance use disorder.  Id.  At step three, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the Listings.  Id. at 133.

The ALJ determined that Plaintiff retains the RFC to perform a full range of work at all exertional levels, with the following non-exertional limitations: Plaintiff can understand and carry out simple, routine, repetitive tasks; sustain attention for extended periods of two-hour segments; maintain regular attendance and be punctual within customary limits; and work in an environment that is free from fast-paced production requirements and involves only simple work related decisions with few, if any, work place changes.  Tr. at 135.  Based on this RFC and the testimony of a vocational expert ("VE"), the ALJ found that Plaintiff could not perform her past relevant work as a receptionist or waitress.  Id. at 143.  However, the ALJ concluded that Plaintiff is not disabled because she can perform other work that exists in the national economy.  Id. at 144-45.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence because the ALJ failed to account for her mental limitations in her ability to interact with others.  Doc. 17 at 10; Doc. 19 at 2.  Defendant responds that the ALJ was not required to adopt Plaintiff's treating physician's opinion that Plaintiff had moderate limitations in interacting with others, and the ALJ's RFC reasonably accounted for Plaintiff's limitations.  Doc. 18 at 6.

### B.    Plaintiff's Claimed Limitations and Testimony at the Hearing[2]

Plaintiff was born on March 23, 1980, and thus was 35 years of age when she applied for SSI and DIB (in December 2015) and 41 at the end of her alleged closed period of disability (September 2021). Tr. at 235, 258. She possesses a GED. Id. at 236. Prior to the onset of her disability, Plaintiff worked as a part-time server from 1996-2001 and from 2008 until her disability onset date, and as a title clerk from 2001-2008. Id. at 623-26. Plaintiff is divorced and has an adult daughter. Id. at 236, 240.

As part of her disability application, Plaintiff completed a function report where she indicated that she lives alone and prepares her own meals, maintains personal care, performs household chores, and shops for grocery and clothing. Tr. at 612-14. She identified watching television and spending time with family, shopping, napping, and adult coloring as her hobbies and interests, and reported that she primarily socializes with her twin sister. Id. at 613-16. She described having a hard time getting along with certain family members and others. Id. at 617. Specifically, she reported getting along "so-so" with authority figures, noting that she is "strong-minded" and speaks her mind regardless of who she is speaking with. Id. at 618. Despite that, she reported that she had never been fired because of problems getting along with others. Id. With respect to her mental impairments, Plaintiff stated that she has experienced mental health issues since she was 14 or 15 years old, that her symptoms had worsened with age, and that "[a]s

---

[2]Because Plaintiff challenges only the ALJ's findings related to her mental impairments and related substance-abuse issues, I limit my review of the testimony to those impairments. I will similarly limit my review of the medical record.

things get worse I stay home in bed." Id. at 612, 616-17.  She reported experiencing racing thoughts when under stress, as well as suicidal ideation.  Id.  Plaintiff also reported taking a number of daily medications and that she had been treated by her primary care physician for mental health, for the previous 22 years, but anticipated starting additional mental health treatment.  Id. at 619.

At the first hearing on March 16, 2018, Plaintiff testified that she had recently been evicted from her apartment and was staying with her sister.  Tr. at 201.  She had been working off and on as a part-time server, but had been in and out of the hospital for the past couple months.  Id. at 203.  Prior to that, she worked as a receptionist for a realty company, but was terminated when the economy crashed.  Id.  Plaintiff testified that since separating from her husband four years earlier, things had gotten "out of hand" and at times she had reached "rock bottom."  Id. at 207.  During those times, she expressed suicidal ideation, though she never believed she would follow through.  Id. at 206-07.  She explained that prior to the divorce, she had a "really good life" and did not have to work much because her husband paid the bills.  Id.

Plaintiff acknowledged a history of substance abuse.  Although at the time of the first hearing she was consuming two to three drinks per day, two to three times per week, she reported that prior to a nine-day hospitalization in December 2017, she had been drinking more than a fifth of vodka per day.  Tr. at 209.  Plaintiff testified that this hospitalization was for psychiatric issues, specifically depression because she had lost her apartment and her car had been repossessed.  Id. at 212.  She also described an earlier

7

hospitalization in August 2017, when she checked herself out after 14 days against medical advice. Id. at 214. Plaintiff denied any history of drug use. Id. at 205-07.

When asked if she had been looking for work, she explained that she would work as a server but would get overwhelmed and had a hard time getting along with people. Tr. at 213. She would do a really good job working with others and then something would happen, leading her to quit or be terminated. Id. She described herself as "very quick to snap off," which made it hard for her to hold a job. Id. at 213, 216. She testified to difficulties concentrating and budgeting money. Id. at 217.

With respect to trauma history, Plaintiff testified that both parents abused her during her childhood, and she witnessed a boyfriend get his leg cut off in a motorcycle accident. Tr. at 216.

At the second hearing held on October 25, 2022, Plaintiff testified that she was then living by herself and working 20 hours per week at a Sheetz convenience store. Tr. at 236. She reported being sober for four years. Id. at 240. Plaintiff stated that during her period of disability she was able to maintain personal hygiene, cook for herself, shop, drive, and perform chores. Id. at 238-39. She spent time with family but otherwise largely kept to herself. Id. at 239. She stated that she is bipolar and is anxious and depressed a lot. Id. at 240. She felt that her mania and anxiety are progressively getting worse as she gets older and found it hard to interact with people. Id. at 241. Although it is unclear whether Plaintiff's job at Sheetz required her to interact with people frequently, she noted that people tend to complain about her and say she is not a very friendly person. Id. at 243. Plaintiff also testified that she was doing alright at work, but

8

explained that she would prefer not to work as much due to her mental and physical health challenges.  Id. at 245-46.

A VE also testified at the second administrative hearing.  Based on a hypothetical individual of Plaintiff's age, education, and work experience with the limitations in the ALJ's RFC assessment, see supra at 5, the VE testified that such an individual could not perform Plaintiff's past relevant work as a receptionist or server.  Tr. at 247-48. However, Plaintiff retained the RFC to perform other jobs existing in the national economy, such as garment folder, sorter, and marker.  Id.  When the ALJ modified the hypothetical to include light-level exertion, no interaction with the public, and only occasional interaction with co-workers, the VE testified that the same three jobs remained available.  Id. at 248-49.  The VE further testified that this individual would be unable to sustain any employment if they consistently missed two or more days per month.  Id. at 249.  In response to a question from Plaintiff's counsel, if the individual were unable to interact frequently with co-workers or supervisors during a week-long training period, the VE conceded that these jobs would not remain available.  Id. at 252-53.

### C.    Medical Evidence Summary

In 2013, prior to her disability onset date, Plaintiff received outpatient mental health treatment through Philhaven Hospital, where she was referred by her primary care physician, Gary Mueller, M.D.  Tr. at 826-29.  The clinicians noted that Plaintiff was having marital difficulties, was feeling anxious, and reported feeling no emotion.  Id. at 826.  Plaintiff reported a history of familial sexual abuse.  Id.  Plaintiff was diagnosed with panic disorder, without agoraphobia, and bulimia.  Id. at 828.

9

On November 2, 2015, Plaintiff saw Dr. Mueller for a medication refill. Tr. at 916-19. Dr. Mueller noted that Plaintiff suffered from anxiety and depression, which were stable. Id. at 917. Dr. Mueller noted financial problems, health issues and family stressors. Id. On April 7, 2016, Dr. Mueller's diagnoses now reflected bipolar disorder in addition to anxiety disorder, depression, and bulimia. Id. at 907. The doctor noted that Plaintiff had thoughts of self-harm and was going to see an intake social worker at Philhaven Hospital for outpatient therapy and a psychiatrist, and that Plaintiff was applying for disability. Id. at 908.

At a clinical assessment at Philhaven in April 2016, the therapist noted that Plaintiff had been divorced for one year and was working as a server. Tr. at 946. Her stressors included her recent divorce, health problems, and history of eating disorder, and she reported passive suicidal ideation. Id. Plaintiff was referred for medication management and it was recommended that she undergo psychotherapy. Id. at 947.

On May 4, 2016, Noretta Kime, Psy. D., performed a consultative psychiatric evaluation of Plaintiff. Tr. at 965-69. Dr. Kime noted that Plaintiff worked as a server three days a week and had been doing so since March 2016. Id. at 965. Plaintiff reported an inability to work due to concentration issues, that she was taking medications prescribed by her family doctor, and noted an upcoming appointment with Philhaven Hospital at the end of the month for both psychiatry and outpatient mental health counseling. Id. Dr. Kime listed Plaintiff's diagnoses as bipolar II disorder with mood congruent psychotic features, generalized anxiety disorder, bulimia, insomnia disorder, and included a rule-out diagnosis of personality disorder. Id. at 968. Plaintiff's

medications included Prozac, Topamax, Wellbutrin, and Restoril.  Id. at 966.[3]  With

respect to her mental health symptoms, Plaintiff reported crying spells, feeling mean,

having difficulties eating, hopelessness, irritability, worthlessness, self-esteem issues,

social withdrawal, and panic attacks occurring approximately once a month and lasting

10 -to- 15 minutes.  Id. at 966.  As to her bipolar disorder, Plaintiff reported excessive

involvement in pleasurable activities, and that she can be "wild" and have "wild ideas"

and spend excessive amounts of money.  Id.

As part of the evaluation, Dr. Kime performed a mental status examination, noting

that Plaintiff's attention and concentration were intact, her recent and remote memory

skills were mildly impaired due to anxiety during the evaluation, and that she appeared

average in cognitive functioning, with fair insight and judgment.  Tr. at 967-68.  Plaintiff

reported that she socializes only with her twin-sister with whom she is "inseparable," and

Dr. Kime noted that Plaintiff was able to perform activities of daily living.  Id. at 968.

Dr. Kime concluded that the results of the examination were consistent with psychiatric

problems, but that those problems did not appear to be significant enough to interfere

with Plaintiff's ability to function on a daily basis.  Id. at 968.  Dr. Kime described

---

[3]Fluoxetine (brand Prozac) is an antidepressant used to treat people with depression, panic, anxiety, obsessive-compulsive symptoms, and bulimia. See https://www.drugs.com/fluoxetine.html (last visited Jan. 30, 2026).  Topamax (generic topiramate) is an anticonvulsant used to treat seizures.  See https://www.drugs.com/topamax.html (last visited Jan. 30, 2026).  Wellbutrin (generic bupropion) is an antidepressant used to treat major depressive disorder and seasonal affective disorder.  See https://www.drugs.com/wellbutrin.html (last visited Jan. 30, 2026).  Temazepam (brand Restoril) is a benzodiazepine used to treat insomnia.  See https://www.drugs.com/restoril.html (last visited Jan. 30, 2026).

Plaintiff's prognosis as "good" and recommended that Plaintiff follow through with her psychological and psychiatric appointments.  Id. at 969.

In a Medical Source Statement ("MSS") of Ability to Do Work-Related Activities, Dr. Kime evaluated Plaintiff as having mild limitations in her ability to understand, remember, and carry out simple instructions, and make judgments on simple work-related decisions, and moderate limitations in her ability to understand, remember, and carry out complex instructions and make judgments on complex work-related decisions.  Id. at 970.  Dr. Kime attributed these limitations to Plaintiff's mood/affect which impaired problem solving.  Id.  Dr. Kime also noted mild limitations in Plaintiff's ability to interact appropriately with supervisors, co-workers and the public, as well as respond to changes in the routine work setting, which Dr. Kime attributed to anger and irritability from anxiety.  Id. at 971.

On May 25, 2016, Plaintiff presented to Philhaven psychiatrist Adham Malaty, M.D., to establish care and adjust her medications.  Tr. at 958-61.  Dr. Malaty noted that Plaintiff had a past psychiatric history of depression, bulimia, and bipolar disorder.  Id. at 958.  Plaintiff reported feeling depressed and that she was not satisfied with the medications that she was getting from her primary care provider, although she stated that she was doing fine on her current medications.  Id.  She rated her depression as 5/10.  Id.  She reported low level of energy and no problems with concentration, and she denied suicidal ideation.  Id.  Plaintiff's screening for PTSD was positive for flashbacks about several traumatic incidents in the past.  Id.  She denied any history of substance abuse.  Id. at 959.  On examination, she presented as mildly to moderately depressed, had poor

energy, and did not have any symptoms of bipolar illness.  Id. at 960.  Dr. Malaty

increased Plaintiff's dosage of Prozac and discontinued Wellbutrin due to Plaintiff's

eating disorder.  Id. at 961.

On May 10, 2016, state agency consultant Jonathan Rightmyer, Ph.D, reviewed

Plaintiff's medical records as part of the initial disability determination for DIB.  Tr. at

262-63, 265-66.  He found mild restrictions of activities of daily living, and moderate

difficulties in maintaining social functioning and maintaining concentration, persistence

or pace.  Id. at 263.  With respect to concentration and persistence limitations, the doctor

assessed Plaintiff as moderately limited in the ability to maintain attention and

concentration for extended periods and to work in coordination with or in proximity to

others without being distracted.  Id. at 265.  Dr. Rightmyer further assessed Plaintiff as

moderately limited in her ability to interact appropriately with the general public, but not

otherwise limited in social interactions.  Id. at 266.  As for adaptive limitations, he

assessed her as moderately limited in ability to respond appropriately to changes in the

work setting.  Id.

On July 1, 2016, state agency consultant Roger Fretz, Ph.D reviewed Plaintiff's

medical records as part of the initial disability determination for SSI.  Tr. at 273-79.  He

noted mild restriction of activities of daily living and maintaining social functioning, and

moderate difficulties in maintaining concentration, persistence, or pace.  Id. at 275.  He

rated Plaintiff as moderately limited in the ability to understand and remember and carry

out detailed instructions and maintain attention and concentration for extended periods.

Id. at 276.  Dr. Fretz evaluated Plaintiff as having no limitations in social interaction or

13

adaptation.  Id. at 277.  The doctor reported that Plaintiff was capable of self-care and personal hygiene, and able to perform activities of daily living, drive, and shop.  Id.  Dr. Fretz further noted that Plaintiff could communicate and engage appropriately in social settings but might require occasional reminders, and that Plaintiff demonstrated some difficulty with attention and concentration.  Id.

On August 10, 2016, Plaintiff saw Dr. Mueller for medication management, and the doctor noted that Plaintiff was doing very well and that she had gone to a psychiatrist at Philhaven.  Tr. at 1058.  Her depression, anxiety, and bipolar were reported as stable. Id. at 1059.  On December 7, 2016, Plaintiff presented to Dr. Mueller for a medication refill, where it was noted that she was feeling stressed out and depressed, perhaps due to sleep issues and restless leg syndrome.  Id. at 1185-86.

On June 7, 2017, Plaintiff was again seen by Dr. Mueller for medication monitoring.  Tr. at 1181-83.  The doctor noted that Plaintiff continued to struggle with normal life, with examination showing normal mood and attention.  Id. at 1182-83.  On August 7, 2017, Dr. Mueller's office dismissed Plaintiff from their practice for violating the office's controlled substances contract by taking "street drugs."  Id. at 1079-80.

On August 2, 2017, Plaintiff went to the emergency room ("ER") complaining of suicidal thoughts and severe depression.  Tr. at 1020.  Steven W. Zebert, D.O., noted that Plaintiff had been self-medicating with alcohol "up to more than 1/5 of vodka a day at times," and that she gets morphine on the street that she takes as needed.  Id.  Plaintiff reported that she was noncompliant with medications, and that she had been sleeping a lot in the past month and had decreased appetite.  Id. at 1094.  She also reported that she

14

was not completing her activities of daily living due to increased anxiety and depression, with stressors noted as witnessing her boyfriend's motorcycle accident, her relationship with her boyfriend including abuse and his impending incarceration, financial stressors, and guilt over the loss of her marriage.  Id.

Following assessment at the ER, Plaintiff admitted herself to Eagleville Hospital, reporting suicidal thoughts.  Tr. at 1008-11.  According to the discharge summary of Hani Zaki, M.D.,[4] Plaintiff reported similar substance use and stressors as she had at the ER, and complained of bipolar disorder and PTSD.  Id. at 1008.  On admission, Plaintiff presented as depressed and withdrawn, complaining of suicidal ideation but agreed to contract for safety.  Id. at 1009.  Upon discharge against medical advice, she was deemed medically stable, but psychiatrically unstable due to anxiety with poor insight and poor judgment.  Id. at 1010.  Her prognosis was described as poor because she made little or no progress toward treatment goals and needed structured, intensive, continuing treatment.  Id.

On December 21, 2017, Plaintiff was admitted to the ER after her mother petitioned for her commitment.  Tr. at 1318.  Plaintiff arrived intoxicated with alcohol in her hand that she refused to give up.  Id.  Plaintiff's mother reported that Plaintiff had a long history of bipolar disorder and was currently in a manic state, and that she had been worse over the last four months with her depression and was suicidal.  Id. at 1028.  Her

---

[4]It is not clear on what date Plaintiff was discharged, but it appears that it was shortly following her admission.  Dr. Zaki noted that she left against medical advice after refusing to retract a 72-hour notice.  Tr. at 1009; see generally 50 P.S. § 7206 (withdrawal from voluntary inpatient treatment).

mother also reported that Plaintiff used "any drug you put in front of her" as well as consuming alcohol daily," id. at 1029, but was not taking her prescribed medication correctly or at all.  Id. at 1318.  Plaintiff reported that she stopped going to her outpatient services at Philhaven and admitted to taking her medication inconsistently.  Id.  She noted a decline in her activities of daily living due to her drinking.  Id.  Plaintiff was involuntarily committed for danger to herself, id., and was transferred to Fairmount Hospital the next day.  Id. at 1317.

Plaintiff remained at Fairmount for one week, and her discharge summary was completed on December 29, 2017, by Brigid Bautista, M.D.  Tr. at 1137-39.  Plaintiff's medications were adjusted during her stay, and she felt better since voluntarily agreeing to remain inpatient.  Id. at 1138.  The doctor noted that Plaintiff was able to complete activities of daily living independently and was working full-time as a server at a restaurant.  Id.  Plaintiff reported improvement in mood, feeling more in control of her feelings and overall changes in her life.  Id. at 1138-39.  Dr. Bautista recommended that Plaintiff attend outpatient therapy, and her discharge prescriptions included Topamax, Cymbalta, and Prozac.  Id. at 1139.[5]

On January 31, 2018, five months after his office dismissed Plaintiff as a patient, Dr. Mueller completed a Treating Source Statement (Psychological) in connection with Plaintiff's disability application.  Tr. 1216-20.  He described Plaintiff's prognosis as poor,

---

[5]Cymbalta (brand name Duloxetine) is a selective serotonin norepinephrine reuptake inhibitor used to treat major depressive disorder and generalized anxiety disorder.  See https://www.drugs.com/cymbalta.html (last visited Jan. 30, 2026).

16

explaining that she suffers from severe psychiatric illnesses that prevent her from being able to maintain a stable life or stable job. Id. at 1216. Dr. Mueller reported that Plaintiff began exhibiting psychiatric symptoms in her teenage years and they had progressed/worsened as she had grown older. Id. He identified anxiety, depression, eating disorder, substance abuse, and bipolar disorder as her primary conditions. Id. Dr. Mueller checked boxes on the form indicating signs of depression, mania, and general anxiety disorder, as well as emotional lability. Id. at 1217. He also checked boxes indicating inability for one or more years to function outside a highly supportive living arrangement, with a continuing need for such structure; a residual disease process resulting in marginal adjustment such that even minimal increases in mental demands or environmental changes would be expected to cause decompensation; health anxiety; and deeply ingrained maladaptive behavior patterns associated with autistic thinking, pathological suspiciousness or hostility, persistent mood disturbance, pathological dependence, unstable interpersonal relationships, and impulsive or self-damaging behavior. Id. at 1217.

Dr. Mueller rated Plaintiff as extremely limited in the ability to adapt or manage oneself; markedly limited in the ability to understand, remember, or apply information, concentrate, persist or maintain pace, and moderately limited in the ability to interact with others. Tr. at 1218. He also rated Plaintiff as markedly limited in remembering locations and work-like procedures, understanding and carrying out very short and simple instructions, and extremely limited in understanding and carrying out detailed but uninvolved written or oral instructions. Id. at 1219. He reported that Plaintiff would only

17

be able to maintain attention and concentration for less than 5 minutes before requiring a break, could not maintain regular attendance and be punctual within customary tolerances, and required enhanced supervision. Id. Plaintiff could sometimes, but not consistently, work appropriately with coworkers and supervisors, did not have the ability to maintain socially appropriate behavior or respond appropriately to changes in work settings, and would likely be off-task more than 25% of the time. Id. at 1219-20. The doctor also indicated that if Plaintiff were to work full-time, she would likely miss more than 4 days per month due to her impairments. Id. at 1220.

On February 26, 2018, Plaintiff had an office visit with Joseph Walden, M.D., to establish primary care. Tr. at 1052. Plaintiff reported that she was doing well on Prozac, Wellbutrin, and Topamax. Id. Dr. Walden noted Plaintiff's symptoms as positive for sleep disturbance, negative for dysphoric mood, self-injury, and suicidal ideas, and that Plaintiff was not nervous/anxious. Id. at 1053. Plaintiff visited Dr. Walden through May 2019. At a visit on June 13, 2018, Plaintiff reported that she was recently released from an alcohol rehab and that she had an upcoming appointment for therapy and psychiatry. Id. at 1235. She reported feeling very well and had not been using any substances or alcohol, and presented with normal mood, affect, and behavior, and was otherwise without complaint or concern for herself. Id. at 1235-36. She also reported that her medications were working well. Id.[6] During follow-up visits on September 5 and

---

[6]Plaintiff reported that she was prescribed Vivitrol at rehab, although it was not among the medications Dr. Walden prescribed. Tr. at 1235-36. Vivitrol is a long-acting injectable form of naltrexone. See https://www.drugs.com/vivitrol.html (last visited Jan.

November 27, 2018, Plaintiff continued to report that her mental health medications were working well.  Id. at 1240, 1244.  At the November visit, Dr. Walden noted that Plaintiff's mood had been well maintained and that she was being seen by a therapist at Philhaven.  Id. at 1244.[7]  On March 5, 2019, Plaintiff described her mood as "extremely well" and reported she was maintaining sobriety.  Id. at 1253.  At a visit on May 15, 2019, Dr. Walden noted that Plaintiff was now in a different recovery house and counseling center, but was otherwise doing well mentally.  Id. at 1257-58.

On June 5, 2019, Plaintiff presented to UPMC Lititz for help with detox.  Tr. at 1582.  Plaintiff reported that she had been taking temazepam (Restoril) for 15 years but ran out and experienced a withdrawal seizure.  Id.  Four days later, Plaintiff went to the ER and requested help withdrawing from benzodiazepines.  Tr. at 1373.  Plaintiff reported that she was currently living in a recovery house and would soon be transitioning to another house.  Id. at 1374.  Plaintiff's mother called the ER and stated that her daughter was at a bar after walking out of a recovery house and may have been manic and confrontational at the bar.  Id. at 1373.  Plaintiff was seen by Jonathan S. Gish, M.D., who indicated that Plaintiff did not have any acute medical complaints, her physical exams were unremarkable, and that the hospital was searching for possible rehab placements for her.  Id. at 1378-79.

---

30, 2026).  Naltrexone (brand ReVia) is used to block the effects of alcohol and opioids.  See https://www.drugs.com/naltrexone.html (last visited Jan. 30, 2026).

[7]The record does not contain notes of treatment at Philhaven during this time period.

On June 16, 2019, Plaintiff was admitted to Pyramid Healthcare Treatment Facilities for a short-term dual inpatient treatment program for severe opiate and severe sedative use disorder, where she remained until July 7, 2019, when she was discharged to a recovery house with a guarded prognosis.  Tr. at 1386.

On July 24 and August 6, 2019, Plaintiff received therapy at Philhaven, where it was noted that Plaintiff struggled with ongoing difficulties related to depression, which she had been trying to manage with alcohol.  Tr. at 1401-02.

On August 1, 2019, Plaintiff saw James Ndungu, NP-C, at Primary Care of York, to establish care.  Tr. at 1530.  NP Ndungo noted that Plaintiff was recently discharged from Pyramid Rehab to be weaned off temazepam, and remained sober, lived in a recovery house and attended AA meetings.  Tr. at 1530-31.  At a follow up appointment on November 12, 2019, Plaintiff reported to NP Ndungu that she had recently witnessed her roommate overdose from heroin use.  Id. at 1746.  Plaintiff reported in late December 2019, that this event was causing her PTSD and affecting her sleep.  Id. at 1747.  Depression was the only listed mental health diagnosis in her appointment records on January 20, 2020, with a note that she had been doing well.  Id. at 1532.  At a follow-up visit on March 16, 2020, NP Ndungu noted that Plaintiff had been seen by psychiatry last month and medications were adjusted.  Id. at 1742.  Plaintiff also reported doing a little bit better, though sleep was not adequate.  Id.  She also reported having a disability application that was pending and that she felt very stressed out about the hearing, because her alimony would run out in three years.  Id.  She stated that she was panicking over

20

what to do as she would be unable to function and had never had a job and felt that mentally she was not ready to even hold a part-time job.  Id.

Between November 19, 2019 and January 29, 2020, Plaintiff received psychotherapy at Philhaven from Debora M. Martinez-Pitre, Psy. D.  Tr. at 1646-61.  On November 19, Plaintiff reported flashbacks, nightmares, and trouble falling and staying asleep in connection with discovering a housemate who had overdosed.  Id. at 1656.  Plaintiff's main concerns during that visit were managing symptoms of PTSD and depression.  Id.  The therapist noted that Plaintiff currently felt down and was likely experiencing a depressed episode, however Plaintiff remarked that things were going "okay."  Id.  Plaintiff also reported that she was then working as a house manager at the recovery house and at the Heritage Hotel.  Id.  Dr. Martinez-Pitre noted that Plaintiff would benefit from outpatient mental health therapy and being referred to a substance abuse evaluation to determine need for further treatment.  Id. at 1658.

On March 9, 2020, Plaintiff presented to Philhaven physician Attiya Kidwai, M.D., for an initial psychiatric evaluation.  Tr. at 1989-92.  Plaintiff described her mood as "up and down" with manic episodes and anxiety, and described panic attacks due to witnessing an overdose of a housemate.  Id.  The doctor continued Plaintiff on Prozac, ReVia, and BuSpar, reduced her Wellbutrin and Topamax, and added Haldol at bedtime to help with sleep and anxiety.  Id. at 1992.[8]

---

[8]BuSpar is an anti-anxiety medication used to treat anxiety disorders or the symptoms of anxiety, such as fear, tension, irritability, dizziness, pounding heartbeat, and other physical symptoms.  See https://www.drugs.com/buspar.html (last visited Jan. 30,

On March 22, 2020, the owner and managing director of A New Life Sober Living wrote a letter of reference for Plaintiff. Tr. at 1663. He wrote that Plaintiff had been living at the house for a year and had been serving as house manager for six months. Id. He described Plaintiff as "an amazing and hard-working person," noting that she "does everything in her power to be the best employee that she can be." Id. at 1663.

On May 13, 2020, Plaintiff reported to Dr. Kidwai that her mood was stable. Tr. at 1983. The doctor tapered Plaintiff off Haldol, and noted that she was prescribed naltrexone. Id. On September 2, 2020, Plaintiff told Dr. Kidwai that she experienced anxiety and panic attacks, and expressed that she could not work for more than 20 hours in a week because of horrible anxiety. Id. at 1973. At a September 24, 2020, follow-up, Plaintiff reported that her mood, appetite, and energy were stable and she was sleeping adequately, but her main complaint was getting panic attacks "out of nowhere." Id. at 1967. On January 6, 2021, Dr. Kidwai again noted that Plaintiff's mood, appetite, energy, and sleep were stable. Id. at 1959.

On May 28, 2021, Plaintiff was admitted to the Behavioral Health Unit of Ephrata Community Hospital for inpatient treatment. Tr. at 1779. Plaintiff reported that she was feeling hopeless and no longer wanted to live, had difficulty sleeping, thoughts of self-injury, low appetite, low energy, poor concentration, and passive suicidal ideation. Id. She was frightened of going to jail because she was in a car accident where she was unconscious in a car after taking too many muscle relaxers, and had recently resolved a

---

2026). Haldol is an anti-psychotic medicine that is used to treat schizophrenia. See https://www.drugs.com/mtm/haldol.html (last visited Jan. 30, 2026).

22

prior DUI case.  Id. at 1782.  Staff noted that Plaintiff's medications were stopped following the recent accident and she was started back on medications including Topamax, Naltrexone, Prozac and BuSpar.  Id. at 1782.  Upon discharge on June 3, 2021, her mental status examination was normal.  Id. at 1783.

Plaintiff had telemedicine visits with Dr. Kidwai for psychiatric medication management through June 2022.  Tr. at 1861-2027.  On May 6, 2021, Plaintiff reported increased anxiety and severe panic attacks, explaining that she had considered calling 9-1-1.  Tr. at 1951.  On June 15, 2021, Dr. Kidwai noted that Plaintiff's anxiety was high due to her impending DUI charge, her mood was "not too good," and she reported nightmares and flashbacks.  Id. at 1944.  On August 5, 2021, Dr. Kidwai noted that Plaintiff reported some anxiety and depression in the context of ongoing stressors such as her DUI charge, but that Plaintiff presented no symptoms of mania or PTSD.  Id. at 1933. On September 2, 2021, Dr. Kidwai reported that Plaintiff's mood was stable and her anxiety manageable.  Id. at 1923.

### D.    Plaintiff's Claims and the ALJ's Opinion

Plaintiff argues that the ALJ failed to adequately account for the severity of her limitations in interacting with others.  Doc. 17 at 11.  She notes that Dr. Mueller assessed her as able to only "sometimes" interact with others in the workplace, while agency examiners Dr. Kime and Dr. Fretz found "moderate" limitations in her abilities to relate

with the public, supervisors, and coworkers.  Id. at 10-11; Doc. 19 at 5.[9]  Plaintiff further

contends that the ALJ incorrectly relied on "inherently sporadic activities" and Plaintiff's

undefined management of a sober home as evidence to support his conclusion that

Plaintiff has only "mild" impairment in social interaction.  Doc. 17 at 11; Doc. 19 at 3.

The Commissioner responds that the ALJ was not required to adopt any one medical

opinion in formulating Plaintiff's RFC, and that the ALJ's discussion setting forth the

RFC recounted all relevant evidence and accurately assessed the limitations caused by

Plaintiff's mental impairments.  Doc. 18 at 6.

The ALJ's consideration of medical opinion evidence is governed by regulations

requiring the ALJ to assign each opinion appropriate weight based on factors such as

whether the physician examined or treated the claimant, whether the opinion is supported

by medical signs and laboratory findings, and whether the opinion is consistent with the

record as a whole.  20 C.F.R. §§ 404.1527(c), 416.927(C).[10]  The ALJ must give

controlling weight to a treating source's medical opinion as to the nature and severity of

the impairment if it is well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence in the

---

[9]Plaintiff's characterization is inaccurate.  Drs. Kime and Fretz each assessed only "mild" limitations in social interaction, tr. at 275, 971, while Dr. Rightmyer assessed a "moderate" limitation in one category of social interaction, namely interaction with the public.  Id. at 266.

[10]Effective March 27, 2017, the Social Security Administration amended the regulations regarding the evaluation of medical evidence, eliminating the assignment of weight to any medical opinion.  See Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017).  Because Plaintiff filed her applications in December 2016, the opinion-weighing paradigm is applicable.

record.  Id. §§ 404.1527(c)(2), 416.927(c)(2).  If not given controlling weight, the ALJ must weigh the treating source's opinion utilizing the aforementioned factors governing medical opinion evidence generally.  Id. §§ 404.1527(c), 416.927(c).

Here, the ALJ summarized Plaintiff's hearing testimony and subjective complaints as well as the medical record evidence and concluded that the medical and other evidence did not demonstrate that Plaintiff suffers from any disabling limitations, and that she retained the RFC to perform a full range of work at all exertional levels, but with certain non-exertional limitations.  Tr. at 135-43.  Those limitations included understanding and carrying out simple, routine, repetitive tasks; sustaining attention for extended periods of two-hour segments; maintaining regular attendance and punctuality within customary limits, and working in an environment that is free from fast-paced production requirements involving only simple work-related decisions with few, if any, workplace changes.  Id. at 135.  The ALJ did not impose any social interaction limitations.

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause her reported symptoms, but that her statements regarding the intensity, persistence, and limiting effects of those symptoms were not fully consistent with the medical and other evidence in the record.  Tr. at 136.  The ALJ explained that Plaintiff had good and bad periods of mental health through the disability period, and that the bad periods were in the context of situational stressors, substance use and medication noncompliance, contrasted with periods during which Plaintiff reported doing well with medications managed initially by her primary care provider and later a psychiatric provider, and when she remained sober.  Id. at 140.

25

In assessing Plaintiff's RFC, the ALJ considered the medical opinions of state-agency consultant Dr. Fretz and consultative examiner, Dr. Kime -- both of whom identified mild limitations in social functioning -- and state-agency consultant, Dr. Rightmyer, who identified moderate limitations in social functioning.  Tr. at 141.[11]  The ALJ assigned these opinions significant weight to the extent they indicated that Plaintiff's mental impairments resulted in no more than moderate functional restrictions during the relevant period.  Id.  The ALJ reasoned that these opinions were supported by the aggravating role that situational stressors, treatment noncompliance, and substance use factored into Plaintiff's symptoms, the improvement in symptoms Plaintiff reported experiencing with medications, and Plaintiff's failure to undergo behavioral therapy beyond a brief period.  Id.

The ALJ also considered Dr. Mueller's opinion which indicated that Plaintiff had several marked limitations, would frequently be off task, and would be unable to maintain regular attendance.  Tr. at 141-42.  Additionally, as relevant here, Dr. Mueller opined that Plaintiff had a moderate limitation in interacting with others, could sometimes, but not consistently, work appropriately with coworkers and supervisors, and would be unable to maintain socially appropriate behavior.  Id. at 141-42.  The ALJ assigned Dr. Mueller's opinion little weight, reasoning that it was rendered after Plaintiff's dismissal from the doctor's practice in 2017, overstated the degree of Plaintiff's limitations in light of the aggravating role played by situational stressors,

---

[11]The ALJ mistakenly stated that Dr. Kime assessed "moderate" social interaction limitations, when, in fact, she assessed only "mild" limitations.

treatment noncompliance, and substance use, and was inconsistent with both Plaintiff's reported improvement on medication and the limited extent of behavioral therapy (which occurred only from November 19, 2019 to January 29, 2020). Id.

As a treating source, to afford Dr. Mueller's opinion "less than controlling weight, the ALJ needed to find the doctor's opinion contradicted by 'substantial evidence,' but not necessarily all evidence." Dimter v. Comm'r Soc. Sec., No. 24-1350, 2024 WL 4986935, at *3 (3d Cir. Dec. 5, 2024).[12] The ALJ satisfied that burden here. He appropriately concluded that Plaintiff's most severe mental health challenges arose in the context of domestic abuse, exposure to traumatic events such as vehicular accidents and overdoses, substance abuse, and financial and legal stressors. Id. at 142 (referring to record evidence discussed at tr. 137-38). The ALJ properly observed that Plaintiff experienced extended periods of stability and improvement in her mental health when she consistently engaged in therapy, adhered to medication management, and those situational stressors were absent. Id. at 137-38. The severe limitations found by Dr. Mueller were thus inconsistent with the evidence in the medical record. Dr. Mueller's opinion is also inconsistent with the other medical source statements of record from Drs. Kime, Rightmyer, and Fretz, none of whom assessed marked limitations in any area. Id. at 141. It is also inconsistent with Plaintiff's activities of daily living during the alleged period of disability, which included living alone, performing household chores,

---

[12]Even though Plaintiff was not a patient at the time he prepared his Treating Source Statement, he was Plaintiff's primary care provider for several years prior. The ALJ, while noting that Dr. Mueller dismissed Plaintiff as a patient, properly identified him as her primary care provider. Tr. at 141-42.

successfully managing a sober living home, and exhibiting no aggressive behavior toward others.  Id. at 140.  Thus, the ALJ's decision not to give controlling weigh to Dr. Mueller's opinions and to give greater weight to the opinions of Drs. Kime, Rightmyer, and Fretz was supported by substantial evidence.

The Court's review is made more difficult because it is unclear whether the ALJ, in not assigning any restrictions on social interaction in the RFC, found no limitations, mild limitations, or moderate limitations in this area of Plaintiff's functioning.[13]  Nevertheless, any error in this regard is harmless.  The VE testified that including a limitation containing no interaction with the public and only occasional interaction with co-workers and supervisors would not erode the base of jobs the person could perform.  Tr. at 248-49.  Thus, even if the ALJ incorporated a moderate social interaction limitation in his RFC, it would not have changed the disability determination.[14]

---

[13]I note that in the context of his step three determination, the ALJ assessed a "mild" limitation in Plaintiff's social functioning.  Tr. at 134.  In support, the ALJ credited Plaintiff's self-reporting that she has problems getting along with family, friends, and neighbors and that she gets along only "so-so" with authority figures.  Id.  However, the ALJ also noted that during the relevant period Plaintiff possessed a driver's license, left her home to grocery shop, appeared cooperative with an adequate manner of relating and maintained appropriate eye contact during a 2016 examination, regularly visited her adult daughter on weekends, served as a house manager at a sober house, and had not incurred legal charges for aggressive behavior toward others.  Id.  Although the severity ratings used at steps two and three are not themselves an RFC assessment, see SSR 96-8p, 1996 WL 374184, at *4 (July 2, 1996), they constitute part of the ALJ's analysis which must be considered as a whole.  See Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004).  Here, the ALJ's step three analysis reflects meaningful consideration of Plaintiff's social interaction limitations.

[14]A moderate limitation in a domain is defined as a "fair" ability to function "independently, appropriately, effectively, and on a sustained basis" in that domain.  20 C.F.R. pt. 404, subpt. P., app 1, listing 12.00.F.2.c; see also tr. at 970 (MSS form defining

Courts have routinely found that such omissions constitute harmless error when the VE considers equivalent limitations at the hearing.  See Bryant v. Commissioner of SSA, Civ. No. 12-2112, 2013 WL 5406674, at *3-4 (N.D. Ohio Sept. 25, 2013) (treating as harmless ALJ's failure to include certain mental limitations in written decision where VE considered those limitations at hearing and testified that same representative jobs would remain available); Dugger v. Berryhill, Civ. No. 18-113, 2019 WL 4023610, at *6-7 (W.D.N.C. June 14, 2019) (ALJ's omission of public-interaction limitation from RFC was harmless where ALJ elsewhere found a mild limitation in interacting with others, included a public-interaction limitation in the VE hypothetical, and relied on jobs consistent with that restriction); Justin T. v. Kijakazi, Civ. No. 20-19061, 2022 WL 6190406, at *3 (W.D.N.Y. Oct. 7, 2022) ("Assuming *arguendo* that the ALJ erred by failing to include 'occasional' social interaction limitations in her RFC finding to account for moderate difficulties in social interaction, such error is harmless, as the positions identified by the [VE] . . . are not precluded by such limitations.").

This conclusion is also consistent with decisions holding that restrictions to occasional interaction with co-workers and supervisors and limited interaction with public adequately incorporate moderate social interaction limitations.  See, e.g., Kerekes v. Kijakazi, Civ. No. 21-247, 2022 WL 4129400, at *4 (D.N.M. Sept. 12, 2022) (restrictions to "incidental interaction with general public" and "occasional interaction

---

"moderate limitation" as "[t]here is more than a slight limitation . . . but the individual is still able to function satisfactorily").  Limiting a plaintiff to occasional interaction with supervisors and co-workers means the plaintiff can engage in such interactions for "up to one-third of the time."  SSR 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983).

with supervisors and co-workers" properly captured moderate social interaction limitations); <u>Stacey C. v. Comm'r of Soc. Sec.</u>, Civ. No. 24-8187, 2025 WL 2171055, at *17 (D.N.J. July 31, 2025) (ALJ's determination that plaintiff had moderate limitation in interacting with others supported finding that she could have occasional contact with supervisors and coworkers).

Plaintiff's specific challenge is that the ALJ did not to adopt counsel's hypothetical limitation excluding any job that would involve frequent interaction with supervisors and co-workers during a brief training period. Doc. 17 at 11 (citing <u>tr.</u> at 252-53). However, the record does not support such an extreme restriction. <u>See</u> <u>Rutherford</u>, 399 F.3d at 553 (ALJ need only include <u>credibly established</u> limitations in the hypothetical to the vocational expert) (emphasis added).[15]

## IV.   CONCLUSION

The ALJ thoroughly summarized the medical evidence record and medical source opinions in formulating his RFC assessment. He provided specific and reasonable explanations for affording more weight to certain opinions, and his findings were supported by substantial evidence. Although the record leaves some ambiguity as to whether the ALJ rejected all social interaction limitations or recognized moderate limitations, he incorporated the most severe limitations into his second hypothetical to the

---

[15]Additionally, it was not improper for the ALJ to consider Plaintiff's management of the recovery home where she lived and her activities such as shopping and attending appointments. <u>See</u>, <u>e.g.</u>, <u>Kara W. v. Comm'r of the SSA</u>, Civ. No. 24-4294, 2025 WL 3763910, at *4 (S.D. Ohio Dec. 30, 2025) (ALJ properly considered plaintiff's use of public transportation, residence in a sober house with roommates, and communication with others when formulating social interaction limitations in RFC).

VE, who testified that the same jobs identified previously remained available.  Therefore, the ALJ did not err in concluding that Plaintiff was not disabled during the closed period of disability.

An appropriate Order follows.